```
                 UNITED STATES DISTRICT COURT

                 CENTRAL DISTRICT OF ILLINOIS


UNITED STATES OF AMERICA,    )
                             )
         Plaintiff,          )
                             )   Criminal No. 1:16-10053
    vs.                      )
                             )
CLIFTON ROBINSON,            )
                             )
         Defendant.          )


          TRANSCRIPT OF TELEPHONIC PROCEEDINGS
        BEFORE THE HONORABLE MICHAEL M. MIHM
                     MOTION HEARING
             JUNE 18, 2020; 12:58 P.M.
                   PEORIA, ILLINOIS
```

APPEARANCES:

For the Government:        DARILYNN J. KNAUSS, ESQUIRE
                           Asst. United States Attorney
                           211 Fulton Street, Suite 400
                           Peoria, Illinois 61602
                           (309) 671-7050


For the Defendant:         **STEFANIE LYNN LAMBERT, ESQUIRE**
                           Federal Criminal Attorneys
                           of Michigan
                           The Guardian Building
                           Suite 2340, 23rd Floor
                           500 Griswold Street
                           Detroit, Michigan 48226
                           (248) 270-6689


            Jennifer E. Johnson, CSR, RMR, CRR
                U.S. District Court Reporter
                Central District of Illinois

Proceedings recorded by mechanical stenography;
transcript produced by computer

1  THE CLERK: Okay. I have Judge Mihm on the
2  line. I'm going to take a quick roll call for him.
3  Clifton Robinson, are you on the line?
4  THE DEFENDANT: Yes.
5  THE CLERK: Stefanie Lambert?
6  MS. LAMBERT: Here.
7  THE CLERK: Darilynn Knauss?
8  MS. KNAUSS: Yes.
9  THE CLERK: Probation Officer Jonathan Young?
10  PROBATION: Here.
11  THE CLERK: And do I have the court reporter,
12  Ms. Johnson?
13  COURT REPORTER: Yes, you do.
14  THE CLERK: Judge, everyone's on the line.
15  THE COURT: All right. Thank you.
16  Stefanie, is your last name Lambert or
17  Junttila?
18  MS. LAMBERT: Both, Your Honor, but I go by
19  Lambert. Thank you for asking.
20  THE COURT: Okay. Thank you.
21  All right. Good afternoon to everyone. We're
22  here because of the motion asking that Defendant
23  Clifton Robinson be released, compassionate
24  release.
25  The first thing I like to consider in

conducting such a hearing is whether or not there is any dispute as to whether or not he has adequately exhausted his duties to make the request and wait for a response.

Mrs. Knauss, at this point in time, is there a dispute about that?

MS. KNAUSS: No, Your Honor. As the government indicated, we're aware that the defendant did, in fact, send an email to B.O.P. staff and also referenced a letter -- which we do not have, but he did reference a letter. So, at this time, we are not contesting exhaustion.

THE COURT: Okay. Thank you.

Then the next thing I'd like to consider on -- in this situation is the situation at the prison.

Ms. Lambert, would you care to address that?

MS. LAMBERT: Yes, I would. Thank you, Judge.

Your Honor, the defendant is housed at FCI Milan here in Michigan, and at FCI Milan, they have reported three deaths. But I'd like to bring to the Court's attention that there's a lot of data and research going on as to how the B.O.P. is reporting COVID positive numbers as well as deaths.

So, it's come to my attention from different resources -- including Johns Hopkins -- that when

someone is removed from the prison and sent to the hospital where they later test positive or die, that that person is not included in the statistics. So, the statistics we have regarding the deaths are -- is my understanding -- the inmates that have actually died within the prison walls.

And then it's also my understanding and it's on the Bureau of Prisons' website that once someone recovers and is no longer testing positive for coronavirus that their number is removed from the positive statistics.

So, when looking at the B.O.P. website, you're seeing the current positive numbers, and it's really an underrepresentation of the number of positive cases and deaths.

THE COURT: Well, hold on a second. Assuming the correctness of that, do you know how many have been removed to the hospital and then died?

MS. LAMBERT: I don't know that number, Your Honor. I do know that at least three inmates have died on the FCI Milan campus and that there have been a number of positive cases. And there's been such a high number within the prison that it's required a lot of movement. They've had to set up quarantine areas. The inmates are being divided

```
 1  between health issues and non-health issues.  It
 2  was reported by one inmate to me that they were
 3  moved to a condemned area of the property to be
 4  more isolated from the other inmates.  But most
 5  concerning to me is that Mr. Robinson, who has
 6  chronic asthma from his childhood, that he is not
 7  completely isolated from the inmates that are sick.
 8       THE COURT:  Let me ask you another question
 9  here.  Hold on.
10       MS. LAMBERT:  Sure.
11       THE COURT:  I know a lot of locations have
12  more than one area; like I know FCI Pekin here, you
13  have an inside and an outside.  Which area is he
14  located in?
15       MS. LAMBERT:  I think Mr. Robinson would
16  better be able to answer that, but he's been moved
17  as a result of the COVID numbers climbing within
18  the prison.
19       And then another important factor for this
20  Court to consider is that all of the inmates are
21  not receiving tests.  So, it's very possible for
22  Mr. Robinson to have contact with staff members and
23  with inmates that have not received a test, where
24  they're positive, and he contracts it.  Only after
25  they become very ill do they receive the test to
```

```
 1  find out if they, in fact, have COVID.
 2       THE COURT:  Mr. Robinson, where are you being
 3  held at Milan?
 4       THE DEFENDANT:  Sir, we still on the compound,
 5  on the inside part of the compound.  But they, they
 6  moved 60 of us that were vulnerable, and they put
 7  us on a unit with people who is recovering from
 8  COVID, and two of -- three of us vulnerable people
 9  has caught it just within the past week, just now.
10       THE COURT:  You're telling me you're in a
11  quarantine area right now?
12       THE DEFENDANT:  Yeah.  Yeah.  The quarantine
13  area -- no, we not in the quarantine area.  We are
14  in an area to stay away from the people with COVID,
15  but what they did was they -- the people that was
16  in this area who had COVID, they moved them
17  somewhere else.  And three people -- three
18  vulnerable inmates that came over with me has just
19  recently caught it within the last week.  So --
20       THE COURT:  All right.  Thank you.
21       THE DEFENDANT:  -- we still at risk.
22       THE COURT:  All right.
23       Mrs. Knauss, do you have any comments on the
24  situation at Milan?
25       MS. KNAUSS:  I can tell you, Your Honor, based
```

on the information provided by the Bureau of
Prisons, is that the numbers of those infected has,
in fact, gone down. As of the last reporting
currently on their website, Milan has eight inmates
that are infected; two staff members are; they've
had the three deaths which was previously
referenced. And still available on the website is
the information of those who have had it and
recovered; that number is 78 inmates and 55 staff
members.

    THE COURT: Okay. And do you have any
additional information about what steps are being
taken to isolate those that have a serious,
heightened risk involved?

    MS. KNAUSS: Your Honor, I cannot speak to the
situation with this particular defendant. We are
aware of other situations where defendants who are,
in fact, extremely vulnerable are, in fact, being
quarantined. This defendant, for example, is not
at a federal medical facility, which is doing a lot
of quarantining, but other than -- I cannot speak
specifically to this particular defendant.

    THE COURT: Well, as I understand it -- let's
see. He was sentenced on October 30th of 2018,
less than two years ago. He received a sentence of

```
 1   63 months.  And his present release date is January
 2   25th of 2024.  Is that correct?
 3          MS. KNAUSS:  Your Honor, excuse me.  May I
 4   interrupt?  Just to -- I believe for clarification,
 5   the defendant was, in fact, sentenced to 63 months
 6   concurrent on the conspiracy count as well as the
 7   wire and mail fraud count, but he received
 8   consecutive sentences with regard to Count 15 and
 9   16.  Count 15 was 24 months consecutive, and Count
10   16 was 12.  I believe his total sentence is 99
11   months.
12          THE COURT:  Okay.
13          MS. LAMBERT:  Your Honor, if I may, the Court
14   was --
15          THE COURT:  Hang on.  Hold on just a minute.
16          Mrs. Knauss, so you're saying his total
17   sentence was 99 months?
18          MS. KNAUSS:  Yes.  You are correct on the out
19   date, though, Your Honor.
20          THE COURT:  How is that possible?
21          MS. KNAUSS:  He had -- he had time in custody,
22   Your Honor, before, before sentencing.  He was in
23   and out on bond.  We had a couple -- one or two
24   bond violations.
25          THE COURT:  Okay.  Ms. Lambert, you were going
```

to say something?

MS. LAMBERT: Your Honor, the Court is correct that we do have the January 25th, 2024, release date, and I think there's some important factors for the Court to consider: That there are positive inmates and staff within FCI Milan currently, right now with COVID. And with the defendant's chronic asthma, that this could be a very severe case, according to the CDC, or a death, should he contract it. So, even if they're quarantining and moving people, each single day matters in --

THE COURT: All right. Well, I appreciate that. You've already made that point, so I'm talking about something else right now.

MS. LAMBERT: Well, with regard to sentencing, I was going to say, Your Honor, he's not asking for the Court to just release him. He would be asking for home confinement where he would continue to serve his sentence within his home on a GPS tether and do any type of terms and conditions this Court ordered. He's not asking just to simply walk free. He's just asking for a sentence that now takes into consideration COVID-19, which was not around at the time the Court fashioned its sentence. So, now he's asking the Court to give him any, you know,

```
 1  hoop to jump through, programs to attend, a tether,
 2  and be confined to his home.  That accomplishes
 3  everything that the Court is looking for as far as
 4  a sentence, but also allows him to stay as healthy
 5  as possible.
 6      THE COURT:  What has his conduct been in
 7  prison?
 8      MS. LAMBERT:  I don't have any --
 9      THE DEFENDANT:  I can answer that.  It's
10  clean.
11      THE COURT:  No, I don't want you to answer
12  that.  I'm talking to your lawyer.
13      MS. LAMBERT:  I do believe that the government
14  attached an exhibit regarding disciplinary issues,
15  and I did not see any on it.  But if the government
16  has information that I do not, I'd like for the
17  government to let the Court know that.  But I am
18  not aware of one single disciplinary issue.
19      THE COURT: All right. Mrs. Knauss, what
20  about that?
21      MS. KNAUSS:  Your Honor, the government has no
22  information that the defendant has any disciplinary
23  violations.
24      THE COURT:  Okay.  So, now I would like you to
25  address the question of whether or not, if I were
```

1  to release him, he would be a danger to the
2  community.
3       Ms. Lambert?
4       MS. LAMBERT: Your Honor, the Court will
5  recall that the crime was financial in nature. The
6  defendant did accept responsibility for his
7  actions, and I don't --
8       THE COURT: Wait, wait, wait. Hold on.
9  Wasn't there a bench trial here? Am I mixing this
10 case up with some other case?
11      MS. LAMBERT: Your Honor, there's a long
12 docket here, and I want to make sure that I have it
13 correct. But I do know that the case involved wire
14 fraud, mail fraud, and it was a financial case in
15 nature, and I --
16      THE COURT: No, I understand. My question is,
17 did he plead guilty, or was, was there a trial? My
18 understanding was there was a bench trial.
19      Mrs. Knauss, do you know the answer to that?
20      MS. KNAUSS: Yes, Your Honor. I was there.
21 It was a bench trial.
22      THE COURT: All right. So, he did not accept
23 responsibility.
24      MS. LAMBERT: With that said, Your Honor, I --
25 I'm sorry for the confusion. It is a financial

crime. I don't have any information that would lead me to believe that Mr. Robinson would be violent in any way.

I know that the probation department did contact the family that Mr. Robinson could live with, his cousin, Cora Shelby (sic), and they did interview. They took no position. And, you know, if the Court relies heavily on what the probation department says, and I'm sure that if the probation department had concerns, that they would let the Court know that.

THE COURT: Well, whether he's a danger to the community or not is just -- not a matter of just whether or not he would be violent or not. The question is whether or not we would have to worry about him committing other crimes, for example, similar to the crimes that he was convicted of.

MS. LAMBERT: Well, Your Honor, I think the significant sentence that he's already served in jail and prison has really given him a wake-up call, along with him being released on a tether, where his whereabouts are, are known to the probation department at all times, and should he violate in any way --

THE COURT: Well, how long has he actually

1  been in custody?
2      MS. LAMBERT:  Your Honor, I see that he had a
3  report date, I believe, of October 30th of 2018,
4  regarding his sentence from the Venerable Court,
5  but he did -- he did get credit for time served
6  while the case was pending, and there's a very
7  lengthy docket.  I think maybe the government would
8  have the best answer as to when he was initially
9  taken into custody.
10      THE COURT:  All right.  Mrs. Knauss, could you
11  answer that question, or could Probation?
12      MS. KNAUSS:  Probation maybe could possibly,
13  Your Honor.  But, again, what becomes problematic,
14  you just can't look at a date that he originally
15  went into custody because he was in and out on bond
16  at least twice.
17      And as far as being tethered, part of the
18  problem, part of the reason -- or the reason,
19  rather, he ended up on that second bond violation
20  is because he couldn't be found and had quite a
21  story about being chased by people with guns or
22  some such thing.  So, it would take someone to sit
23  down with pen and paper, Your Honor.  But he was in
24  custody a substantial portion of the time prior to
25  trial, but he was also out on bond for a period of

```
 1  time.
 2       THE COURT:  He did abscond on bond for a
 3  period of time?
 4       MS. KNAUSS:  It was a bond violation because
 5  he couldn't be found for a few days.  The problem
 6  came up, Your Honor, he was supposed to live in --
 7  he indicated he was going to live in one location,
 8  but then he couldn't because he was a registered
 9  sex offender.  We had to find a different place,
10  and the place he went to said he was -- people from
11  the neighborhood chased him out because he was on
12  the sex offender list.
13       THE COURT:  Okay.  Probation have any
14  additional insight on his conduct while on bond
15  prior to trial?
16       PROBATION:  Just reviewing his PSR, does look
17  like he surrendered bond and was arrested; at least
18  twice he was brought back into custody.  But that
19  would be all that I have.
20       THE COURT:  Why was he taken back into
21  custody?
22       PROBATION:  Have to see -- sorry.
23       THE COURT:  I'm sorry?
24       PROBATION:  I'm trying to pull up the report
25  to see why he was brought back into custody.
```

1      MS. KNAUSS:  Your Honor, if I could ask the
2  Court to recall, one of those bond hearings started
3  in front of the magistrate, and then the Court did
4  a review of the -- of the revocation of his bond.
5  And we heard from Probation, as I recall, up in
6  Chicago about their directions to him and his
7  failure to follow those directions.  And again it
8  involved --
9      THE COURT:  Yes.  I'm sorry.  I do remember --
10 I remember the situation.  Okay.  Thank you.
11     All right.  Well, as I understand it,
12 Probation did look and see whether there was a
13 viable release plan if the Court grants it.  As I
14 understand it, he has a relative who's willing to
15 take him in.
16     So, I think now I'm ready to hear brief final
17 arguments from both sides on whether I should grant
18 the motion or not.
19     Miss Lambert, we'll start with you.
20     MS. LAMBERT:  Thank you, Your Honor.
21     Your Honor, Mr. Robinson is diagnosed and the
22 government has provided two exhibits regarding his
23 chronic asthma that he has had since a child.  On
24 those exhibits it notes that he needs an inhaler up
25 to four times a day for the severe asthma that he

```
 1  has.  I think that indicates to the Court that
 2  every single day matters, and should he contract
 3  COVID-19, that he would have severe respiratory
 4  distress that would be very likely, if not death.
 5       And we know that on prison property that
 6  there's a limited medical treatment center that
 7  consists of a handful of nurses, usually no
 8  doctors, and it's not necessarily within the
 9  inmate's control as to whether or not they get
10  medical treatment.
11       It would be much safer for Mr. Robinson to be
12  on a tether and have the ability to seek emergency
13  care, should he somehow contract COVID-19 and have
14  respiratory distress.
15       So, it's our position, Your Honor, that we
16  respectfully request that he not just walk away
17  from his sentence; that he continues to serve his
18  sentence that has been modified in light of COVID
19  and his asthma diagnosis within his home, with his
20  family, that Probation has already looked into, on
21  a tether and put forth any terms and conditions
22  that the Court would like to see Mr. Robinson
23  satisfy.  And, of course, should he violate any
24  terms, he could go back into prison.
25       You know, we do believe he's served a
```

1  significant amount of time, and he will comply with
2  any terms set forth by the Court.
3      THE COURT: All right. Thank you.
4      Mrs. Knauss?
5      MS. KNAUSS: Your Honor, this defendant is in
6  custody because of a -- I believe it was a $1.4
7  million scheme. And it wasn't just that he did
8  this himself, but he enrolled others in the scheme,
9  people who otherwise had no criminal history but
10 were taken in by him and assisted him.
11     So, to say that he is now going to be
12 tethered, I don't know what's going to tether him
13 because it didn't work before when he was on bond.
14 As indicated, he has a bond violation.
15     It was clear that he did not accept
16 responsibility for what he did.
17     He has asthma, yes. It does not say that he
18 has severe asthma. And he wants to be released to
19 the Chicago area where they have over 4300 deaths
20 and over 85,000 cases of COVID. The government
21 suggests he's safer where he's at right now.
22 There's nothing other than this asthma, which is
23 not particularly severe, as is demonstrated, he
24 uses an inhaler. At the time of the presentence
25 report, he stated he was in good health, and it

18

1   took his mother to tell the probation officer about
2   the fact he even had asthma.
3       The government strenuously asks that this
4   defendant stay in custody.
5       THE COURT:  All right.  Give me a minute to
6   think about this.
7       (A pause was had in the record.)
8       THE COURT:  First of all, I want to thank
9   counsel for the quality of your briefs and the
10  quality of your argument.
11      My decision in this case is I'm going to deny
12  the request.  He was convicted of a long-standing
13  crime where he did, in fact, involve others to help
14  him execute the crime.  He was very good at doing
15  that.
16      He did not accept responsibility for his
17  conduct.  There were bond issues.  And I'm just not
18  satisfied, in spite of Miss Lambert's arguments,
19  that he would not be a danger to committing
20  additional crimes if he is released at this point
21  in time.
22      So, with all due respect, I'm going to deny
23  the request.
24      Anything else today?
25      MS. LAMBERT:  Thank you, Your Honor.

1  THE COURT: Thank you.
2  MS. KNAUSS: Thank you.
3  THE COURT: All right. Bye-bye.
4  (Proceedings concluded at 1:22 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Jennifer E. Johnson, CSR, RMR, CBC, CRR, in and for the United States District Court for the Central District of Illinois, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 7th day of July, 2020.

/s/ Jennifer E. Johnson
JENNIFER E. JOHNSON
CSR, RMR, CBC, CRR
License #084-003039